UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 17-21734-CIV-MORENO/GOODMAN

SCHLOMY DIAMONT, et al.,

    Plaintiffs,

v.

SCOTTSDALE INSURANCE COMPANY,

    Defendant.

_____/

## REPORT AND RECOMMENDATIONS ON
## DEFENDANT'S MOTION TO ENFORCE SETTLEMENT

Defendant filed a Motion to Enforce Settlement [ECF No. 14], Plaintiff filed a response [ECF No. 15], and Defendant filed a reply [ECF No. 16]. United States District Court Judge Federico A. Moreno referred the motion to the Undersigned. [ECF No. 17]. After a Zoom evidentiary hearing and supplemental briefing, the Undersigned issues this Report and Recommendations and **respectfully recommends** that Judge Moreno **deny** Defendant's Motion to Enforce Settlement. [ECF No. 21].

This recommendation arises from the following straightforward circumstances: Plaintiffs' counsel has unequivocally testified that he never had his clients' approval to accept a global settlement offer, his clients unequivocally testified that they never provided the requisite settlement authority, Defendant demanded a release of all claims

by Plaintiffs but it never mentioned a release in its "global" offer, and Defendant's alternate suggestion that only a portion of the purported global settlement be enforced is inconsistent with its earlier refusals to enter into that type of more-limited arrangement.

Although settlement agreements are favored and should be enforced whenever possible, they may not be enforced when a critical requirement like the client's consent is absent.

I. **Factual and Procedural Background**

This lawsuit involves a property insurance claim which Plaintiffs, Schlomy Diamont and Sara Lipskar, submitted to their insurance carrier, Defendant Scottsdale Insurance Company. [ECF No. 1]. The parties disagreed about the amount of loss. They resolved this disagreement through appraisal. [ECF No. 6-3]. Scottsdale paid the appraisal award in full. [ECF No. 6-4].

Plaintiff's counsel then requested attorney's fees and costs. Scottsdale objected, contending that Florida law does not authorize attorney's fees and costs under the circumstances. Counsel for both sides then exchanged emails.

On September 9, 2019, Daniella Chacoa, an associate in The Rock Law Group (which represents Scottsdale), sent an email to Jonathan Korin, who represents Plaintiffs. [ECF No. 14-1, p. 3]. The email said, in relevant part:

> To ratify our conversation, in response to your $6,500.00 counter-demand, our client has authorized me to extend a counter-offer of $6,000.00, to globally resolve this matter, including any and all pending and potential claims. Please be advised this is our client's bottom dollar offer. Our offer

2

expires on Friday, September 13, 2019. If we are unable to resolve this matter by then, we will proceed with filing a Motion to Dismiss.

*Id.*

Approximately 11 minutes later, Katherine Bender, an associate in Mr. Korin's office, responded in an email: "Jonathan has agreed to accept your offer of $6,000.00, and resolve this matter." *Id.* at p. 2. She copied Mr. Korin on the email.

Four minutes after that, Ms. Chacoa advised both Mr. Korin and Ms. Bender in an email that she would "send you confirmation tomorrow and draft the release." *Id.*

Thirty-five minutes later, at 6:59 p.m., Mr. Korin sent a reply email, "What's the release for? We'll just file a voluntary dismissal with prejudice." *Id.*

The next morning (September 10, 2019) at 11:02 a.m., Ms. Chacoa responded:

> Thank you for your email. The release provides our client the assurance that this case is fully resolved, and that **no additional claims, including extra-contractual claims,** remain pending and/or will subsequently be filed and this matter will remain ongoing indefinitely. For this reason, and as indicated in my correspondence containing our counter, our offer was global, to resolve this matter **including any and all pending and potential claims.**
>
> Accordingly, in order for our client to issue the funds, **we would need your client to execute a release, globally releasing our client from this matter.** I will draft our standard release and forward it to your office, along with confirmation of the settlement. Please let me know if you would like to discuss this matter further.

*Id.* at p. 1 (emphasis added).

On September 19, 2019, in connection with the ongoing dispute over Scottsdale's request for a release for the so-called global settlement, Mr. Korin and Ms. Chacoa

3

exchanged emails. Mr. Korin took the position that "the release should be regarding the claim for attorney's fees only." [ECF No. 22-1, p. 4].

The next day (i.e., September 20, 2019), Ms. Chacoa sent another email to Mr. Korin: "Our offer, which you accepted, was to **globally resolve the matter, including any and all pending and potential claims**, not for the attorney's fees portion. **Our client does not partially settle claims**. The release encompasses any and all claims, in accordance with our agreement." *Id.* at p. 3 (emphasis in original).

Both sides threatened to seek attorney's fees and costs if the other side did not agree to their position.

A few days after Ms. Chacoa's email, Mr. Korin sent an email to Ms. Chacoa on September 24, 2019. His email said, in relevant part:

> My position is as follows. I believe my interpretation is correct, that we were discussing the fee issue only. As we both know well, there has already been an appraisal on this claim. The only issue left is fees, which you agree are owed. So there should be no reason for my client to be releasing yours regarding the entire claim.
>
> Also/moreover/however, even if your interpretation of our communications were correct, **my office did not have authority to offer a release of our client's claim**. Because we thought we were discussing the fees issue only, we **never asked our clients to agree to a release of their potential claims against your client. Since we didn't have authority** to offer a "global" release of all claims from our client, there could be no such binding agreement.
>
> I will give you until the end of this week to either agree to my position (that we settled only the fees portion) or to admit that there was no agreement.

*Id.* (emphasis added).

4

On December 16, 2019, Ms. Chacoa forwarded by email a more-formal letter, on her firm's official letterhead, to Mr. Korin, who responded by email later that day. In his response, Mr. Korin said:

> Looking back, you are right that the offer of $6k (at least in writing) was to resolve all claims, not just attorney's fees. However, as I've told you, **I did not have authority to accept that offer.** As you know, Florida law is clear that when an attorney accepts a settlement without authority from his/her client, there is no settlement. I believe I've been quite open and honest with you about this issue. If you would like an affidavit from clients to this effect, we can provide one.

[ECF No. 22-3, p. 1 (emphasis added)].

The parties were unable to resolve the dispute, and Scottsdale finally teed up the issue with its motion to enforce settlement. [ECF No. 14]. Plaintiffs filed an opposition response and Scottsdale file a reply. [ECF Nos. 15; 16].

The Undersigned held a Zoom evidentiary hearing in which Mr. Korin and both Plaintiffs testified. [ECF No. 21]. All three witnesses testified that Plaintiffs had never given Mr. Korin authority to release any claim or potential claim.

At my direction [ECF No. 23], the parties also filed post-hearing memoranda on the issue of whether an enforceable settlement agreement is created when an attorney represents that he has settlement authority from his client, the other side relies on that representation and enters into a settlement but it turns out that the attorney did *not* in fact have the requisite authority. [ECF Nos. 24; 25]. The Undersigned required the additional memoranda because Scottsdale's counsel contended that an enforceable

5

agreement would be created in that scenario. Similarly, he said he believes that an attorney *can* bind a client into a settlement agreement without obtaining his client's authority.

    a. <u>A Few Observations</u>

Ms. Chacao's September 9, 2019 email, the one which Plaintiffs purportedly accepted through Ms. Bender's succinct email response, makes no mention of a release.

The so-called acceptance was sent by an associate, not Mr. Korin.

Mr. Korin immediately rejected the notion of a release the first time it was mentioned by Scottsdale's counsel.

Plaintiff, Schlomy Diamont, testified that he has no recollection of even speaking with Mr. Korin or any other lawyer in his office in September 2019.

**II.  Applicable Legal Principles & Analysis**

Parties may enter into a settlement agreement without a formal settlement document if "[e]xecution of the settlement agreement is not a condition precedent to a settlement agreement, but rather is merely a procedural formality." *Swift Fin. Corp. v. Latin House Grill, LLC*, No. 16-23903-CIV, 2017 WL 8895346, at *4 (S.D. Fla. Dec. 29, 2017), report and recommendation adopted, No. 16-23903-CIV, 2018 WL 1894718 (S.D. Fla. Feb. 5, 2018).

Florida law is clear that a settlement can be reached through a series of email exchanges. *See Warrior Creek Development, Inc. v. Cummings*, 56 So.3d 915 (Fla. 2d DCA

2011). Federal courts within the Eleventh Circuit have likewise held that a binding settlement agreement can be reached via email. *In re Rolsafe Int'l, LLC*, 477 B.R. 884, 902 (Bankr. M.D. Fla. 2012).

"Settlements are highly favored and will be enforced whenever possible." *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1318 (11th Cir. 2014) (quoting *Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985)); *see also Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1486 (11th Cir. 1994) ("We favor and encourage settlements in order to conserve judicial resources.").

Settlement agreements are governed by contract law and therefore, there must be a "meeting of the minds as to the essential settlement terms in order for settlement agreements to be enforceable." *Lunas v. Cooperative De Seguros Multiples De Puerto Rico*, 100 So. 3d 239, 241 (Fla. 2d DCA 2012) (internal citation omitted). As *Lunas* and many cases explain, a valid and enforceable agreement is not created merely when the parties meant the same thing; it is only when they say the same thing -- when they exchange sets of external signs. In *Lunas,* the court noted there was no agreement because the agreement to pay "policy benefits" did not state an actual dollar amount, which is described as an "essential element." *Id*. at 242. Moreover, the terms of the agreement provided for the issuance of two checks. *Id*. When only one check was issued instead, that indicated that the parties did not say the same thing. *Id*.

Under Florida law, "[a] party seeking to compel enforcement of a settlement bears the burden of proving that an attorney has the clear and unequivocal authority to settle on the client's behalf." *Sharick v. Se. Univ. of Health Scis., Inc.*, 891 So. 2d 562, 565 (Fla. DCA 2004) (citing *Cross-Aero Corp. v. Cross-Aero Serv. Corp.*, 326 So. 2d 249, 250 (Fla. 3d DCA 1976)); *see also Weitzman v. Bergman*, 555 So. 2d 448, 449-50 (Fla. 4th DCA 1990) (noting that "it is the burden of the party seeking to compel the settlement . . . to show that the attorney had authority to settle the case"); *Jorgensen v. Grand Union Co.*, 490 So. 2d 214, 215 (Fla. 4th DCA 1986) ("The law is clear that a client's express authority given to his attorney to settle his cause of action must be clear and unequivocal").

An attorney's mere employment does not meet this burden nor does an attorney's belief that he or she possesses such authority. *See Cross-Aero Corp.*, 326 So.2d at 250; *Weitzman*, 555 So. 2d at 449 ("Caselaw indicates that courts have been very stringent in what they find to be a 'clear and unequivocal' grant of authority."); *Dixie Operating Co. v. Exxon Co., U.S.A.*, 493 So. 2d 61, 63 (Fla. 1st DCA 1986) (declining "to place the determination of whether clear and unequivocal authority was given under the control of the attorney exercising the authority on the basis of good faith belief when a dispute over that authority arises between the attorney and client").

Instead, as explained in *B.T. by and through Tompson v. Target Corp.*, No. 17-60871, 2017 WL 4868788, at *2 (S.D. Fla. Oct. 27, 2017), Florida law requires that an attorney have "clear and unequivocal authority to agree to a binding offer or agreement on a client's

behalf." *See, e.g., Sharick*, 891 So. 2d at 562, 565 ("Absent clear and unequivocal authority from Sharick, Tobkin could make neither a binding offer nor a binding agreement on Sharick's behalf. Tobkin's lack of authority to settle on Sharick's behalf is, therefore, dispositive."). Thus, as applied in *B.T.*, "[i]n order to make that determination, the Eleventh Circuit has made clear that Mr. Levy's testimony is *required* to assess the scope of his authority to settle the case." *B.T.*, 2017 WL 4868788, at *2 (emphasis in original) (citing *Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1486 (11th Cir. 1994) ("Summary enforcement of an alleged settlement is improper when there is a substantial factual dispute as to the terms of the settlement.")).

Because there was a factual dispute over Mr. Korin's authority to enter into a settlement requiring his clients to sign a release concerning potential claims, the Undersigned held the evidentiary hearing. *See Batton v. City of Jasper, Ala.*, 354 F. App'x 400, 402 (11th Cir. 2009) (holding that district court abused its discretion by enforcing the proffered settlement agreement without holding an evidentiary hearing and remanding for a factual determination "of whether plaintiff expressly authorized her attorney to accept the settlement agreement the defendants proffered to the court").

At the hearing, defense counsel questioned the credibility of Plaintiffs' counsel, but the Undersigned has not received any *evidence* to support that defense theory. The mere fact that Scottsdale may have a hunch that Plaintiffs' counsel came up with an after-the-fact rationale (that he never had authority to settle) to avoid the settlement agreement

9

does not make it so. First, both Plaintiffs provided corroborating testimony. Second, the Undersigned has not seen any evidence to suggest that Mr. Korin perjured himself to lend credence to the lack of settlement authority explanation.

In its post-hearing memorandum, Scottsdale conceded that the only Florida case it found on point in response to the Undersigned's question generates the conclusion that an enforceable settlement agreement would not have been reached if a client's attorney expressly but erroneously advised the opposing party that his client had given him authority to settle. *See Sharick*, 891 So. 2d at 564 (reversing an order enforcing a settlement where the attorney did not have his client's actual authority to settle, even though the attorney told opposing counsel that his client "had given him express authority to settle").

Florida law recognizes exceptions to the general rule that an attorney does not have apparent or implied authority to settle their client's claim merely because the client retained the attorney.

The first exception is when an attorney is confronted with an emergency which requires immediate action to protect the client's interests and consultation with the client is impossible. *Collado v. Pavlow*, 951 So. 2d 69, 71 (Fla. 5th DCA 2007). The second is when a client gives his clear and unequivocal special or express authority to compromise his cause of action. *Id.* The third is where an unauthorized compromise is ratified by the client. *Id.*

None of those exceptions apply here.

Although Scottsdale now concedes that an enforceable settlement agreement requires the client's consent notwithstanding what his attorney *says*[1] about having authority, it argues that a partial settlement concerning a compromise of Mr. Korin's fees for $6,000 should be enforced. There are problems with this theory.

**First,** it assumes that a release would be provided, but this is far from clear. Scottsdale never mentioned a release in the email offer it made on September 9, 2019. So Scottsdale did not expressly mention a release as being a condition to its "global" offer, and the Undersigned is not convinced that a release is somehow automatically included in the settlement merely because releases are frequently (though not always) part of settlements.

The Court notes that several Florida cases held that settlement agreements not containing specific terms about releases and similar provisions (such as a hold harmless agreement or an indemnity agreement) are not sufficiently clear to constitute an enforceable agreement.

In *Thompson v. Estate of Maurice*, 150 So. 3d 1183, 1188 (Fla. 4th DCA 2014), the settlement offer did not include indemnification language. When the defendant conditioned its acceptance upon executing a release that introduced broad

---

[1] Neither Mr. Korin nor his associate ever *expressly* advised Scottsdale or its defense lawyers that they had authority to settle the claims (for attorney's fees and Plaintiffs' other potential claims) in exchange for a release from their clients.

11

indemnification language, the court found that this injected an essential new element of the agreement whereby the parties had not actually agreed. *Id.* The court therefore reversed the summary judgment even though it acknowledged that "a release is implicit in an offer of settlement," but it noted that the plaintiff contends that there needs to be an agreement about the "character, nature or type of release to be used." *Id.* (internal citation omitted). The court noted that the defendant insurance carrier conditioned its acceptance of a settlement offer upon the execution of a release that introduced broad indemnification language, thereby injecting a "new essential element of the agreement" into the negotiations. *Id.* (internal citation omitted).

Similarly, in *Gaines v. Nortrust Realty Management, Inc.*, 422 So. 2d 1037, 1038 (Fla. 3d DCA 1982), the parties "agreed" to exchange "releases" as part of a settlement. When the formal documents included general releases and one of the settling parties refused to sign because he was willing to sign only a limited release, the court found that this ambiguity alone was sufficient to find that there had been no agreement. *Id.* at 1040. Citing other cases, the *Gaines* court stated that the settlement had to be clear, full, complete, "cover all issues, and [be] understood by all litigants concerned." *Id.* (internal citations omitted). After noting that the type of release "to be exchanged was neither clearly expressed nor mutually understood during the discussions[,]" the court reversed the summary judgment. *Id.*

*Pena v. Fox*, 198 So. 3d 61, 64 (Fla. 3d DCA 2015) involved an analogous scenario and the court there held that additional language in the release submitted by the insurance carrier was enough to find there was no agreement. In holding that no settlement had been reached, the appellate court explained that "while we share the circuit court's view that the inclusion of Mr. Fox's agents and employees within the release was not the product of nefarious motives, USAA's intention when it drafted this document, whatever it might have been, was irrelevant to the issue at hand." *Id.* (internal citations omitted).

And in another Florida appellate case, an insurer, who included a proposed hold-harmless agreement that was construed as a counter-offer, had not proved a "mirror image" response to the proposed settlement agreement, which meant no settlement agreement had been created. *Peraza v. Robles*, 983 So. 2d 1189, 1192 (Fla. 3d DCA 2008).

**Second**, Scottsdale already rejected Mr. Korin's proposal to settle only the attorney's fee claim without a release by Plaintiffs of other claims, saying that it did not settle cases on a piecemeal or partial basis. Scottsdale's motion seeks to enforce a settlement agreement it claims already exists. It does not seek to craft a new one by arguing that the only actual dispute remaining is for attorney's fees and that Plaintiffs did not need to authorize that type of settlement. But Scottsdale previously took the position that there was no settlement unless and until Plaintiffs signed a release and released their potential other claims.

13

### III.   Conclusion

For the reasons outlined above, therefore, the Undersigned **respectfully recommends** that Judge Moreno **deny** Scottsdale's motion to enforce settlement agreement.

### IV.   Objections

The parties will have **14** days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within **14** days of the objection. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, December 16, 2020.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Federico A. Moreno
All counsel of record